O’NIELL, J.
Mente & Co. sued Abram Kap-lan for $8,750, the invoice price of 100,000 rice sacks alleged to have been sold and delivered to him at $87.50 per M, less $1,000 paid on account and less $45.10 credited for a bale of sacks that he had returned.
In answer to the suit Kaplan acknowledged having bought the sacks, but alleged that there was a shortage in the number and weight of sacks delivered, and that Mente & Co. had violated the contract in other respects. Kaplan therefore set up a reconven-tional demand for damages exceeding plaintiff’s demand by $918, and prayed for judgment accordingly.
Judgment was rendered in favor of Mente & Co. for the amount sued for, less a credit of $216.65 for shortage in the weight and number of sacks delivered. Kaplan’s recon-ventional demand for damages was rejected at his cost, and he prosecutes this appeal.
The only issue before us is appellant’s demand for damages and for an increase in. the price allowed for the shortage in weight and number of sacks delivered.
[1 ] Among the items of damages claimed is a demand for $5,000 punitive damages, which cannot be allowed and is virtually abandoned by appellant. It is now well settled that a court having jurisdiction only in civil cases cannot impose a penalty in the form of punitive damages, but is confined, in allowing damages for breach of contract, or for an offense or quasi offense, to compensation for the loss or injury suffered.
Appellant’s complaint, in substance, is that Mente A Co. violated the contract of sale by refusing to ship the sacks promptly when they were needed, as required by the contract, and that he (Kaplan) was thereby deprived of a profit of $2,229.56 that he would have made upo'n 35,673 sacks if they had been shipped in time to be used by the rice farmers to whom he would have sold them. The profit is figured at $62.50 per M, the difference between the contract price of $87.50 and the alleged market price of $150 per M. In addition thereto, appellant claims $68 for insurance paid on 10,673 sacks that he carried over .to the next rice harvesting season. The other 25,000 of the 35,673 sacks on which defendant claims he lost a profit were not shipped at all. *681 Tlie question is whether Mente .& Co. was under obligation to ship them.
The contract, as we interpret it, was to furnish Kaplan what sacks he would require from time to time during the harvest season, not less than 100,000, nor more than 125,000, at the price stipulated. The proposition in writing was submitted by Mente & Co. to Kaplan, who, after making a change in the proposed terms, signed and returned it, viz.:
Mente & Co.
New Orleans, La. July 10/14.
Sold to A. Kaplan, Esq., Crowley, La., 100,-000 to 125,000 64/9 oz. bags, §87.50 f. o. b.
Terms: All bills to be due in January, 1915. Interest at the rate of 6 per cent, to be charged on each item commencing .30 days from date of shipment.
All contracts are accepted subject to delays resulting from strikes and other unavoidable causes. Our responsibility ceases on our receiving signed bill of lading from transportation company. This contract expresses entire agreement.
[Signed] J. C. Werner, Mgr. Accepted:
[Signed] A. Kaplan.
All orders taken subject to approval of credit by home office.
The transaction had been negotiated by telephone and was confirmed by letter of Mente & Co., inclosing duplicate copies of the proposed contract, with the request that Kaplan sign them and return one. The terms proposed by Mente & Co. were these:
“Terms: Four months net from date of shipment, 6 per cent, interest per annum to be added.”
On the.next day after receipt of the proposed contract Kaplan returned one of the copies signed by him, in a letter dated July 11,1914, reading as follows:
“I return herewith signed contract for the 100,000 to 125,000 64/9 oz. bags, at $87.50, New Orleans. I have changed the terms somewhat, which I trust will meet with your approval.”
With regard to the proposed change of terms, Mente & Co. replied, on July 4, 191.4, as follows:
“Wish to thank you for yours of the 11th. In reference to terms, we have submitted same to our Mr. Benjamin and will answer you in a few days regarding this. * * * Thanking you very much, and assuring you we appreciate this business, and that we will get these goods out in September, we remain,” etc.
Mr. Benjamin was, to the knowledge of Mr. Kaplan, the head of Mente & Co.’s home office in New York, the office referred to in the notation on the original proposition, “All orders taken subject to approval of credit by home office.”
Mr. Benjamin was reluctant about approving the credit or change of terms, because Mr. Kaplan had not yet settled his account for bags bought in 1913, and he did not pay the balance then due until the 22d of August, 1914. It appears that Mr. Benjamin therefore did not approve the credit or change of terms until the early part of September, 1914. In the meantime the European War had come on, and, because of the financial difficulties and the difficulty and doubt about the importation from India of the burlap for making the bags, Mente & Co. appealed to their customers generally, and to Mr. Kaplan particularly, to pay cash, if possible, on all invoices.
On the 6th of August, 1914, Kaplan gave shipping orders for two carloads of sacks, 30,-000 to be shipped to Estherwood, La., and. 30,-000 to be shipped to Gueydan, La. Notwithstanding the New York office of Mente & Co. had not yet approved the credit or change of terms proposed by Kaplan, the New Orleans office shipped the 60,000 sacks as ordered, mailing invoices stating: “Terms as agreed.”
Within a week Kaplan ordered another carload of sacks to be shipped to Crowley, .La., and a few days later, that is, on the' 19th of August, 1914, ordered 5,000 sacks to be consigned to A. R. Arceneaux, at Welsh, La. Ip *683 the letter containing the last order he asked that the car that he had ordered shipped to Crowley be rushed, if it had not been already shipped. Two days later, that is, on the 21st of August, 1914, Kaplan called at the office of Mente & Co. in New Orleans and gave another order for 5,000 sacks, to be shipped to Crowley, La. Assuming that the carload already ordered shipped to Crowley would amount to 30,000 sacks, as did the carload already shipped to Estherwood and the carload shipped to Gueydan, Kaplan had then, on the 21st of August, 1914, ordered the entire 100,-000 sacks, notwithstanding Mente & Co.’s promise was to ship them in September. The record shows, too, that in previous years Mr. Kaplan used very few- of the season’s supply of sacks in August, ordering most of them in September and some in October. It is apparent, therefore, that he was ordering ahead of the season in 1914, because of his fear that Mente & Co., on account of the war, would not be able to supply all of their customers.
It appears that in the conversation Had between Kaplan and a Mr. Rhea, representing the firm of Mente & Co., in the latter’s office in New Orleans, on the 21st of August, 1914, Mr. Kaplan was told that Mr. Benjamin had instructed the New Orleans office not to ship to Mr. Kaplan except for cash or on bills of lading attached to sight draft. After the conversation on that day Kaplan wrote to Mente & Co., confirming his conversation with Mr. Rhea, and demanding shipment of the sacks that he had ordered. On the next day following he remitted $200.30, the balance due on his 1913 .account, and in the letter containing the remittance he complained of a shortage in weight and number of the sacks that he had received. On that day Mente & Co. replied to Mr. Kaplan’s letter of the 21st of August, saying that there was a misunderstanding as to the details of the conversation had with Mr. Rhea, and saying that, as he (Mr. Kaplan) was informed in the conversation of the day before, the matter of terms and shipment had been referred to Mr. Benjamin, with the request that he wire his instructions. Kaplan waited until September 4, 1914, and then notified Mente & Co. in writing that unless the firm would ship the sacks that he had ordered in accordance with the contract he would hold the firm responsible for his loss of profit which would be, as he said, approximately $62.50 per M. Three days later, that is, on the 7th of September, 1914, Mente & Co. replied that they would ship a car of bags the next week, and asked for shipping instructions. On the same day Kap-lan gave written instructions to ship 5,000 bags not later than the 10th and 5,000 not later than the 11th of September, 1914, or, if Mente & Co. preferred, to ship the 10,000 bags in one shipment to Rayne, La., not later than the 11th of September, and on the 8th of September, 1914, he directed that the carload of sacks that had been ordered shipped to Crowley be shipped to Estherwood, La. Both shipments, the 10,000 sacks consigned to Rayne and the carload containing 30,000 sacks consigned to Estherwood, were loaded on cars on the 11th of September and hauled out by the railroad company on the 12th, and the bills of lading were received on the 14th of September.
The record shows that the firm was then ready and willing to ship an additional 25,000, according to the contract, if Kaplan had ordered them.
Kaplan testified that the reason why he did not order the extra 25,000 sacks from August 21st to September 7th was that he had then lost the opportunity of selling them. There is no dispute that he did not order them before August 21st or before September 7th, or at any time after. There was no obligation on the part of Mente & Co. to ship 125,000 sacks before August 21, or before September 7, 1914, even if Kaplan had given shipping instructions for the entire 125,000 sacks so early in the season.
Although Mr. Kaplan complained several *685 times of a shortage in the weight and number of sacks shipped him, he did not make a claim for any loss suffered by delay in the shipments until the 13th of February, 1915, when Mente & Co. requested a settlement of the account. He then wrote that several matters would have to be adjusted before he would settle the account, viz.:
“The matter of your not shipping me the bags when they were ordered, which was not in accordance with our contract, and thus caused me to lose the profit on the same.
“The goods not being up to the quality you sold.
“The shortage in the number of bags contained in the many bundles.”
It is important that even then, in the last letter written by Kaplan previous to the filing of this suit, he made no complaint of the failure of Mente & Co. to ship more than the 100,000 bags. His first complaint on that score was made in answer to this suit.
[2] As Kaplan ordered only the 100,000 bags that he was bound to take according to his contract, and did not avail himself of the option of ordering an additional number of bags not exceeding 25,000, we find no merit whatever in his complaint that Mente & Co. did not ship more than the 100,000 bags.
[3] As to the alleged loss of profit and cost of. insurance on the 10,673 bags that Kaplan carried over to the season of 1915, it is to be observed that he accepted the last two shipments without complaint, on or about the 14th of September, 1914, and that Mente & Co. was not bound to ship any of the sacks before September, 1914.
The record discloses that Mr. Kaplan sold the 10,673 bags at a profit, that is, at prices ranging from $120 to $140 per M, in 1915. Our opinion is that it was for the purpose of that speculation that he stored and insured the bags and carried them over to the season of 1915, in preference to returning them to Mente & Co. at the end of the season of 1914, when the war was on and the price high. Even if Mr. Kaplan had been justified in demanding shipment of the balance of the 100,-000 bags as early as the 21st of August, 1914, the evidence would not convince ns that Mente & Co.’s refusal to ship until the 7th of September caused the alleged loss.
[4] With regard to the allowance of $216.65 for shortage in weight and number of bags delivered, it appears that the bags were supposed to weigh 1 pound each. Kaplan complained of shortages amounting to 2,476 pounds or bags, and in the judgment appealed from he has credit for that number of pounds or bags at the invoice price, $87.50 per M. He asks now that the credit be increased to the market price, $150 per M. The bags were shipped, according to custom, in bundles containing 500 bags and weighing 500 pounds to the bundle, and the evidence is that a slight variance in the weight of such bundles of bags is not unusual. The shortage in this case, being, according to the figures furnished by Kaplan and not checked by Mente & Co. less than 2% per cent, of the total weight and number of bags ordered, is not extraordinary. It is not contended that the shortage was a willful or deliberate violation of the contract. In fact, Mr. Kaplan did not so regard it, because, when, at the request of Mente & Co., he returned one of the bundles which he said was short in weight and number of bags, he charged Mente & Co. for the bundle at the invoice price, $87.50 per M. Our opinion is that the invoice price, $87.50, not the market price, is the price at which Mr. Kaplan is entitled to credit for the entire shortage complained of, in the absence of any showing of willful violation of the contract.
The judgment appealed from is affirmed.
MONROE, C. J., takes no part.